CHICAGO, ROCK ISLAND & PACIFIC RAILWAY
COMPANY *v.* WILLIAMS.

4-7004 · 169 S. W. 2d 123

Opinion delivered March 8, 1943.

*Thos. S. Buzbee,* for appellant.

*Sam Costen* and *Elton A. Rieves, Jr.,* for appellee.

GRIFFIN SMITH, C. J. Heth is a small community in St. Francis county traversed by appellant's railway, from which a switch line runs to Cooper's gin. Appellee procured judgment against the railway company for $1,921.35 to compensate loss of eighteen bales of cotton he claims to have delivered for shipment September 13, 1941. Before acknowledgment by the company that the cotton had been received it was destroyed by fire. The question is whether there *was* delivery.

Gladstone Williams, appellee's father, supervised picking, ginning, and marketing of his son's crop. During 1937 and 1938 Gladstone managed Cooper's gin. The railway company did not maintain an agent at Heth. When shipping facilities were required the conductor on a local freight operating between Brinkley and Memphis would be contacted, and in turn the conductor would have cars placed on the house track. Gladstone's explanation was that when the "local" came in the conductor would call at the gin to ascertain if a shipment was ready, and would sign a receipt. Bills of lading were not issued. The witness recalled one occasion when the same train that brought an empty car waited until it was loaded and "picked it up" for delivery in Memphis.

W. M. Borum was manager of the gin in 1941 when appellee's cotton was destroyed. At that time a telegraph operator was stationed at Heth and transacted certain restricted business for the railway company. Friday morning, September 12, Borum asked the operator to inform the conductor a car was needed. Appellee was anxious to get the shipment into Memphis not later than the following day. Saturday afternoon, when the "local" came from Brinkley, it stopped at Heth. A car was placed on the siding and the train proceeded five or six hundred yards to another gin. When Borum observed a freight car had been "spotted," he assumed it was placed in response to the request he had made. At that time the cotton was on a platform.

There was the further assumption on Borum's part that the conductor, after completing his business at the gin east of Cooper's, would return and pick up the car. Only a short period of time—perhaps ten minutes—was required for loading. When work of placing cotton in the car was almost finished, witness got in a truck and hurried to the second gin to see the conductor, but before Borum reached his destination the train left. Borum thought the car was loaded about four o'clock. The destructive fire occurred that night about eight o'clock.

It is not contended the conductor, or anyone representing the railway company, actually knew cotton had been placed in the car, although Gladstone Williams testified he explained to Borum on Friday that he wanted a bill of lading so it could be mailed to Sternberger-McKee in Memphis Monday. Evidence directly affecting attempted shipment was summed up in the question directed to Borum, "All you did was to tell the [telegraph operator] the day before—on Friday—that you wanted a car spotted to take out a shipment of cotton to Memphis?" Answer, "Yes, sir." [The same request was repeated on Saturday.]

Gladstone Williams was at the gin when the car was put on the sidetrack, and asked Borum to have the eighteen bales loaded. The work was done by five men under Borum's directions. Williams had prepared a bill of lading.

W. D. Jones, colored, who helped load the car, testified no other shipments of cotton were made in 1941 by having the train wait to pick up a car which the same train had put on the siding to be loaded.[1]

Conductor G. F. Padgett testified that the operator at Heth informed him on Friday or Saturday a box car was needed at Cooper's gin. Train records kept by the witness showed arrival at 12:45 and departure at 1:05. Padgett did not see any employes of the gin company, and, of course, had no conversation with them. The customary method of handling cotton from Cooper's gin was to evidence the transaction by a conductor's waybill, "which is no more than a receipt for the shipment." He did not think it possible for the car to have been loaded with eighteen bales during the twenty-minutes stop at Heth. Witness had been on the Memphis-Brinkley run a year and had not handled any cotton from Cooper's gin. Prior to September 13, 1941, the gin company ordered three cars for loading. They remained "on spot" for several days with only a small quantity of cotton in them, and were eventually taken out empty. In conclusion the witness testified, "I have never been asked to give a receipt or a conductor's waybill for any cars, and they have never made an out-shipment over our line."

To dispose of this case by reversal or affirmance invokes a harsh rule. Clearly it was the shipper's intent, manifested through Borum, to have a car sidetracked in order that appellee's cotton might be shipped not later than Saturday, and in endeavoring to finish loading before the train left, diligence was displayed if, in fact, the train did not reach Heth until nearly four o'clock, as two of the witnesses for appellee testified from memory. If the conductor's records were correct and leaving time was 1:05, loading must have occurred after the train

---

[1] Frankness of testimony given by Borum is refreshing. The following question was asked by counsel for appellee: "Mr. ["Bat"] Harrison asked you [regarding your conversations with the telegraph agent] . . . I want you to make it clear to the jury whether, in these conversations—when you asked the agent for the car—state whether you made it clear to him that you wanted the cotton brought out on Saturday." Answer: "I believe he understood me that way." Question: "Is that what you did say to him?" "That is the impression I wanted to make on him—and to make sure [the cotton] went out on Saturday I tried to catch the conductor of the train."

left. We must accept findings inferentially made by the jury that the train was at the east gin not later than 3:40, if twenty minutes be accepted as the stop-over period.

If we affirm, the railway company is required to pay for a commodity it had not accepted unless the naked act of sidetracking a car carried with it the implied invitation to make use of such facilities at the carrier's risk. The question then arises, To whom was the shipment to be delivered? There were no directions in this respect, no proof that the bales were marked as to consignee: nothing more than Borum's belief that the telegraph operator understood it was necessary that the cotton reach Memphis Saturday.

May liability be predicated upon this slender thread? The question seems to have been answered by Mr. Justice HART who wrote the court's views in *Matthews & Hood* v. *St. Louis, Iron Mountain and Southern Railway,* 123 Ark. 365, 185 S. W. 461, L. R. A. 1916E, 1194. There is the relatively unimportant distinction between the instant case and the Matthews decision that no agent was maintained at Gossett, and it was not contemplated that the same train that left a sidetracked car would wait for it to be loaded and then take it away. In the case at bar there is no substantial evidence of the custom appellee contends prevailed, although there is proof that Williams and Borum *intended* certain results.

But hopefulness does not necessarily acquire the attributes of law unless there has been dereliction of duty upon the part of the one sought to be charged. Unfortunately appellee's representatives took chances on leaving the cotton in a box car, loading of which was unknown to appellant. That loss must be sustained does not of itself fix responsibility; nor do facts bring the case within the rule that the shipper must account where there has been a completed act of delivery.

The judgment is reversed and the cause dismissed.